UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JASON F. MONK,

                                          Plaintiff,

              v.                                                    5:05-CV-430
                                                                    (NAM/GJD)
COMMISSIONER OF SOCIAL SECURITY,

                                          Defendant.
_____

CHARLES E. BINDER, ESQ., for Plaintiff
WILLIAM H. PEASE, Asst. U.S. Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

        This matter was referred to me for report and recommendation by the Honorable

Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. §

636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with General

Order 18.

## PROCEDURAL HISTORY

        Plaintiff filed applications for disability insurance benefits and Supplemental

Security Income on December 18, 2002, alleging disability beginning June 1, 2002.

(Administrative Transcript ("T."), 38-41, 243-46).  The applications were initially

denied.  (T. 27-32, 247).  Plaintiff requested a hearing before an Administrative Law

Judge ("ALJ"), and a hearing was held on June 30, 2004.  (T. 33, 255-82).  At the

hearing, plaintiff was represented by counsel from the law firm which represents him

on this appeal (Plaintiff's Brief, 1).  At the request of plaintiff's counsel, the ALJ

allowed the record to remain open for an additional four weeks so that plaintiff could

submit further records from the Joslin Diabetes Center, emergency room records, Family Health Network records, and Empire Vision records.  (T. 280-81).  The ALJ did reopen the record one month later on July 30, 2004, to receive records from Cortland Memorial Hospital, Family Health Network, and Upstate Medical University.  (T. 281-82).  The record was further reopened on August 5, 2004 to enter an additional 14-page exhibit from Upstate Medical University.  (T. 282).

In a decision dated August 27, 2004, the ALJ found that plaintiff was not disabled.  (T. 12-19).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on February 10, 2005.  (T. 3-5).

## CONTENTIONS

The plaintiff makes the following claims:

(1) The ALJ failed to consider the severity of plaintiff's foot ulcer and vision impairments.  (Plaintiff's Brief, 11-14).

(2) The ALJ's assessment of plaintiff's physical residual functional capacity is not supported by substantial evidence in the record.  (Plaintiff's Brief, 14-18).

(3) The ALJ failed to consider plaintiff's non-exertional limitations.  (Plaintiff's Brief, 18-19).

The defendant argues that the Commissioner's determination is supported by substantial evidence in the record, and must be affirmed.

## FACTS

A.    <u>Non-Medical Evidence and Testimony</u>

Plaintiff, who was 33 years old at the time the ALJ rendered his decision, has a

General Education Development (GED) diploma. (T. 261). He stated that he last worked in June 2002 as a dock worker for Airborne Express. (T. 262-63). Plaintiff testified that he left his job because he was on his feet "too much" and had a hard time seeing the bar codes on the packages. (T. 263). Plaintiff also noted that he was previously employed as a quality assurance inspector in a bra factory. (T. 264).

Plaintiff then testified that his disability results from his diabetes, which began when he was two and one-half years old. (T. 265, 275). He stated that his main problems associated with the diabetes are his eyesight, inconsistent blood sugar levels, and ulcers on his feet. (T. 266-72). Plaintiff testified that he had laser surgery on both eyes and became color blind after the surgery. (T. 266). He asserted, however, that the functionality of his eyesight depended on his sugar levels and that if they were under control, he could "get around[.]" (T. 267). Plaintiff then stated that he takes insulin shots to control the diabetes but that his blood sugar[1] levels fluctuate "up and down all the time" despite the treatment.[2] (T. 267-68). (T. 268).

Plaintiff further testified that he suffers from ulcers at the bottom of his feet and that he can only stand for ten or fifteen minutes as a result. (T. 269). Plaintiff stated that he lost both of his big toenails two years prior to the hearing, some of his teeth have fallen out, and that he was recently diagnosed with arthritis. (T. 269, 271).

---

[1] The normal blood sugar range for people without diabetes is about 70 to 120 and for diabetics, the range is between 90-130. *See* National Diabetes Information Clearinghouse, http://diabetes.niddk.nih.gov/dm/pubs/type1and2/what.htm; *see also* Islets of Hope for Persons with Diabetes, http://www.isletsofhope.com/diabetes/symptoms/normoglycemia_1.html.

[2] Plaintiff testified that on the rare occasion when his blood sugar was very low, he had to go to the hospital to get treatment. (T. 180-91, 271-72).

3

Plaintiff has been separated from his wife for approximately eight years, and has lived alone in his current apartment for three years.  (T. 261-62, 272-73).

Plaintiff stated that he is able to drive locally but due to his poor eyesight, he refrains from traveling long distances and to places with which he is not familiar.  (T. 262, 277).  In regards to household chores, Plaintiff testified that he cooks his own meals, except for the occasions when he drives to have dinner with his mother, does his laundry, and cleans his house, although he takes breaks during all of his chores.  (T. 273, 278).  He also stated that he is able to dress himself and take care of his personal needs.  *Id.*  He then testified that on a typical day, he mainly watches television for about six hours, listens to the radio, and takes naps.  (T. 273-75, 278).

When asked by the ALJ about his physical capabilities, plaintiff responded that he is able to sit for only twenty minutes and cannot walk very far or for a long time.  (T. 270).  He also stated that he can lift more than a gallon of water or even a twenty pound bag of dog food.  *Id.*  He testified that he had a hard time with gripping and opening jars and that he experienced occasional numbness and cramping in his hands.  (T. 270-71, 276-77).  Plaintiff further stated that he has trouble climbing stairs and that when he climbs the three flights of stairs to his apartment, he has to rest for five or ten minutes in the hallway before resuming.  (T. 276).  He also noted difficulty with kneeling and squatting.  (T. 279).

In response to his attorney's questions, plaintiff stated that he has ulcers on both feet (T. 275), and that most of the time, his feet ache and are numb (T. 276).  The numbness travels up his lower leg, and plaintiff stated that "the back of [his] calf

4

muscles are deteriorating."  (T. 276).  When sitting, he usually elevates his feet to

reduce aching.  (T. 276).  His mother assists him in opening bottles or medicine

containers.  (T. 277).  He stated that reading for any period of time gives him a

headache.  (T. 278).  When his sugar level is high, he becomes fatigued, and takes

naps 3 or 4 times each week.  (T. 278).  As stated above, the ALJ gave plaintiff's

counsel additional time to obtain and file additional medical records.  (T. 280-81).

**B.**     **Medical Evidence**

> **1. Dr. George J. Ang, SUNY Upstate Medical University, Joslin Diabetes Center, Treating Physician**

Dr. George Ang, at the Joslin Diabetes Center, began treating plaintiff for his

diabetes on August 8, 2002.  (T. 89).  Plaintiff related to Dr. Ang that he is able to

walk his dog on a regular basis but that he has poor vision and painful feet from an

ulcer.  *Id.*  Plaintiff also told Dr. Ang that he has not been checking his blood sugar

because his meter was not working.  *Id*.  He stated that he does not know if he has

hypertension or high blood cholesterol.  *Id.*  He also told Dr. Ang that he has

"retinopathy" and last visited an ophthalmologist one year ago.  *Id.*  He told Dr. Ang

that his energy is "better recently," and that he walks his dog on a regular basis.

Plaintiff stated that his eyes bother him, and he has poor vision and poor color vision.

(T. 89).

On physical examination, Dr. Ang found normal blood pressure, pulse rate, and

heart sounds.  He found a one centimeter dried ulcer on plaintiff's fourth toe of his

right foot, and another dried ulcer on his left foot.  The toenails on plaintiff's great

toes were evulsed.  Plaintiff's blood sugar reading was 308.  Dr. Ang diagnosed plaintiff with Type 1 diabetes, with a history of retinopathy and neuropathy "under poor control."  Dr. Ang gave plaintiff a new meter to test blood sugars, and instructed plaintiff and his mother on usage of the meter.  He directed plaintiff to check blood sugars four times daily.  (T. 90).  Dr. Ang discussed plaintiff's smoking and complications of diabetes, and referred plaintiff to "podiatry at Joslin."  (T. 90).

On November 21, 2002, Dr. Ang reported that there were multiple ulcers on plaintiff's feet.  (T. 241-42).  However, he noted that they were almost dry, there was minimal secretion, and there was no evidence of cellulitis.  (T. 241).  Dr. Ang stated that he would adjust plaintiff's diabetic medications and recommended that he see a diabetes educator and an eye doctor.  *Id.*  Thereafter, on March 19, 2003, Dr. Ang stated that plaintiff's feet showed no edema, the dorsal superficial toe ulcers were dry except for a little secretion on the third toe on the left foot, and there was no evidence of erythema or pyogenic secretions.  (T. 237-38).  He noted that plaintiff's diabetes was poorly controlled because of his poor diet.  (T. 237).  Dr. Ang further noted that while plaintiff's mother asked him to complete a disability form, it was the policy of his office not to fill out disability forms as those should be completed by the patient's primary care provider.  *Id.*  Dr. Ang further stated,

> we see patients to help them with their diabetes control and get them out of Disability if possible.  I encouraged Jason to continue to follow up with us.  I emphasized that he has to try to control his diet, as he is tired of progression of his diabetic complications.

(T. 237).

Subsequently, on July 14, 2003, Dr. Ang examined plaintiff and found that he

had no edema of his feet, the nail beds on his toes were dry, there was no pus, and no foot ulcers were noted.  (T. 235-36).  He also told plaintiff that he was improperly mixing his medications and that he needed to be in better control of his diabetes.  (T. 235).

On November 18, 2003, Dr. Ang noted that plaintiff's feet showed no edema, the nail beds of the toes were dried, and there were no secretions, foot ulcers, or evidence of infection.  (T. 233-34).  He indicated that plaintiff was in poor control of his diabetes and that he was recommending that plaintiff be examined by an opthamologist.  (T. 233).  Dr. Ang noted that plaintiff was "very irritable and quite rude," stating that plaintiff "is quite frustrated with his having diabetes and wanting to be on disability."  (T. 233).  On March 19, 2004, Dr. Ang examined plaintiff and found no foot ulcers.  (T. 231-32).  He stated, however, that plaintiff's diabetes was poorly controlled, that he was lowering the dosage of Lantus insulin so that he could take Humalog, and that he was recommending that plaintiff consult with a nurse educator and dietician.  (T. 231).

**2.  Dr. Gerard C. Saponara, Treating Podiatrist, Joslin Diabetes Center**

Dr. Saponara, a podiatrist, by referral from Dr. Ang, examined plaintiff on August 27, 2002, for complaints of wounds on his feet.  (T. 87-88, 92-93).  The examination revealed that plaintiff had vascular status with posterior tibial and dorsalis pedis pulses bilaterally, vibratory was decreased distally to the "MP joints of both feet[,]" and light touch and sharp sensation was absent distally to the MP joints

and ankles of both feet.  *Id.*  The ulcers were noted and Dr. Saponara recommended orthopedic shoes and diabetic socks.  (T. 88).  He found no spreading cellulitis or lymphangitis, and no drainage coming from these wounds.  *Id*.  Dr. Saponara also stated that plaintiff should use sterile saline to clean the wounds followed by Silvadene cream and dry sterile dressings.[3]  *Id.*  Dr. Saponara had a "long discussion" with plaintiff about his diabetes and urged plaintiff to stop smoking since the smoking was "detrimental to his diabetic condition."  *Id.*

On September 10, 2002, plaintiff returned for a follow-up visit and Dr. Saponara noted that the wounds had healed "wonderfully" with the silvadene cream and there was no sign of infection, cellulitis, or lymphangitis.  (T. 91).  Dr. Saponara noted that plaintiff did not need to apply any more dressings because of the absence of infections.  Dr. Saponara scheduled a return visit in one year unless plaintiff had some problem which required an immediate visit.  (T. 91).  Subsequently, on April 15, 2003, plaintiff was again examined by Dr. Saponara.  (T. 239).  Dr. Saponara noted that plaintiff's first toenails came off and that plaintiff would clean the area and wrap them with cream in order to heal the area.  *Id.*  According to plaintiff, the problem with his toe nails falling off had been going on for "a couple of years," but plaintiff had not developed any bacterial infection, cellulitis, or lymphangitis.  *Id.*  Dr. Saponara recommended that plaintiff wear an extra-depth shoe and diabetic socks to help with the problem.  *Id.*  Dr. Saponara scheduled a return visit for one year unless a problem arose.  (T. 239).

---

[3] During the examination, Plaintiff stated to Dr. Saponara that he smoked two packs of cigarettes a day for the past fifteen years.  (T. 87).

### 3.  **Family Health Network of Central New York, Inc.**

Plaintiff was treated by the staff at the Family Health Network ("FHN") from February 2001 through July 2004.  (T. 98-127, 139-176, 217-27).  The record contains a plethora of examination and treatment notes for that time period.  *Id.*  Many of these visits were for routine medical problems.

On May 1, 2001, Registered Nurse (RN) Kathleen Fitzgerald noted that plaintiff's blood sugar level that morning was 125 but that he was not fully compliant with his medical routine.  (T. 114).  She also indicated that she filled out a statement from "motor vehicles" stating that plaintiff could drive as he did not have any blackouts or episodes of keyoacidosis.  *Id.*  On May 9, 2001, lab tests showed that plaintiff's blood sugar level was 71.  (T. 123).  On March 21, 2002, lab tests ordered by Nurse Practitioner (NP) Jennifer Wheaton, who worked at FHN as well as Cortland Memorial Hospital, revealed that plaintiff's blood sugar level was 217.  (T. 122).  On June 11, 2002, it was noted that plaintiff had a small ulcer on the second toe of his left foot.  (T. 106).  Plaintiff was told by medical staff to keep the toe clean and he was referred to the Joslin Diabetes Center.  *Id.*  On July 1, 2002, medical staff indicated that plaintiff's blood sugar was between 180 and 200 that morning and that an ulcer on his left second toe was improving as it was dry and scabbed.  (T. 104).  On August 26, 2002, it was noted that there was a lesion on plaintiff's skin but the medical staff cleansed the area.[4]  (T. 102).  Then, on November 26, 2002, on a form used to write

---

[4] It was also indicated that plaintiff quit smoking for two weeks.  (T. 102).

prescriptions, NP Wheaton stated that she is treating his Type 1 diabetes, and that plaintiff would be unable to work full time.  (T. 98).  She stated that his condition was chronic and not expected to improve significantly.  (T. 98).  On November 30, 2002, notes indicate that plaintiff was being "followed" by Joslin Center and his blood sugars remain between 200 and 300.  (T. 99).

Subsequently, on February 20, 2003, medical staff noted that there was a small superficial ulcer on his second and fifth toes on his left foot.  (T. 167).[5]  Then, on May 30, 2003, a note was made that all of plaintiff's teeth "were absent" and he was waiting for dentures.  (T. 165).  An examination of his foot also revealed that plaintiff's nails from his two big toes were absent and that special orthopedic shoes were being made.  *Id.*[6]  Notes from December 2003 and February 2004 indicate that plaintiff's blood sugar level was in the 200s.  (T. 143-46).

On May 27, 2004, plaintiff complained of arthritis in his hands and back pain. (T. 221).  It was noted that plaintiff had full range of motion of his back.  *Id.*  The next day, due to plaintiff's complaints of joint pain in his hands and back, NP Wheaton ordered that x-rays be taken.  (T. 192).  The x-rays of his hands revealed normal alignment and position of the bones as well as no fractures or radiopaque foreign bodies.  *Id.*  X-rays taken of his thoracic spine showed minimal dextroscoliosis, no fractures, destructive osseous lesions, or sublaxation, and mild degenerative changes

---

[5] Then, in March 2003, a mammography of a lump in plaintiff's right breast revealed that the lump was benign.  (T. 171, 195).

[6] Later, in September 2003, plaintiff was examined several times for left elbow pain and told to take Tylenol.  (T. 149-60, 197-204, 208-11, 214).  An x-ray taken of the left elbow showed normal alignment and position, no joint effusion, and no acute abnormalities.  (T. 215).

10

along the vertebral body endplates.  (T. 193).  X-rays of the lumbar spine revealed normal alignment, that vertebral bodies and disc spaces were well maintained, that SI joints were unremarkable, and pedicles and posterior elements were intact.  (T. 194).

On June 14, 2004, in a letter, NP Wheaton stated that plaintiff was disabled and unable to work due to diabetic complications that included neuropathy, retinopathy, and diabetic nephropathy.  (T. 176).  She stated that plaintiff would not be able to be on his feet or work for any period of time and that he did not have the "endurance to tolerate demands of a work setting."  *Id.*  NP Wheaton concluded that plaintiff was susceptible to hypoglycemia,[7] his prognosis was poor, and his condition was life long. *Id.*

Subsequently, on June 28, 2004, NP Wheaton examined plaintiff for complaints of arthritis pain.  (T. 219).  An arthritis panel was drawn and tests were negative.  *Id.* Hand x-rays were also negative but there were some degenerative changes noted in his back.  *Id.*  Plaintiff was told to take Naprosyn.  *Id.*

### 4.  Dr. Anthony Andrews, Ophthalmologist - Upstate Medical University, Department of Ophthalmology

Plaintiff's counsel wrote to Dr. Andrews prior to June 18, 2004.  (T. 228).  In his return letter dated June 18, 2004, Dr. Andrews stated that plaintiff had been "following here" until 1996 when plaintiff was "lost to follow-up."  (T. 228).  Dr. Andrews examined plaintiff on April 4, 2004, and found that plaintiff's corrected

---

[7] Hypoglycemia is an "abnormally low concentration of glucose in the blood."  THE AMERICAN HERITAGE MEDICAL DICTIONARY 389 (Revised ed. 2007).

visual acuity was 20/30 in plaintiff's right eye and 20/40 in the left eye.[8]  (T. 228).  Dr.

Andrews's report states that plaintiff noted "no change in his vision since 1996."  (T.

228).  Dr. Andrews's letter states that he enclosed medical records from June 1, 2002

to the present.  (T. 228).  The record does not appear to contain those records for 2002

or 2003.  The record does contain notes from plaintiff's examination of April 8, 2004.

(T. 229-30).  Dr. Andrews noted that the center of vision showed some diabetic

changes but an Optical Coherence Tomography test showed no abnormalities.  *Id.*

While finding that plaintiff has proliferative diabetic retinopathy, Dr. Andrews stated

there was no active disease present and that there was no limitation on plaintiff's

activity.  *Id*.

### 5.  **Dr. Berton Shayevitz, State Agency Consultative Examiner**

On February 19, 2003, plaintiff was consultatively examined by Dr. Shayevitz.

(T. 128-32).  In a report, Dr. Shayevitz noted that plaintiff's blood sugar that morning

was 249 and that he had had ulcerations on some of his toes intermittently over the

past year.  (T. 128).  Plaintiff stated to Dr. Shayevitz that he was able to cook, clean,

do the laundry, shop, manage money, socialize, shower, bathe, and dress himself.  (T.

129).  Plaintiff indicated, however, that he is dependent on his mother.  *Id*.  Upon

physically examining plaintiff, Dr. Shayevitz found he was in no acute distress, gait

---

[8] It is common that a person must possess 20/40 vision in order to receive a driver's
license.  *See* The Eye Digest, http://www.agingeye.net/visionbasics/healthyvision.php.
Furthermore, in determining visual acuity, generally the larger the second number is, the worse a
person's vision becomes.  *Id.*  20/20 vision is considered normal whereas 20/200 vision or worse
is considered as the legal definition of blindness.  *Id.*

and stance were normal, squat was full, he could walk on heels and toes without difficulty, he needed no help getting on and off the examining table or changing for the exam, and he could rise from a chair without difficulty.  (T. 130).

Dr. Shayevitz reported that the vision in both of plaintiff's eyes was 20/40, sclerae[9] were anicteric,[10] conjunctivae[11] were clear, pupils were equal, round, and reactive, extraocular movements were intact, and a funduscopic exam showed multiple lasered areas and disruption of the blood vessel.  *Id*.  Dr. Shayevitz also noted that there was full range of motion of the cervical and lumbar spine, hand and finger dexterity was intact, and grip strength was 5/5.  (T. 131).  However, Dr. Shayevitz found that there was decreased sensation to touch below his wrists and ankles bilaterally and thickening of the first IP and DIP joints of the last four digits of both hands, there was erosion of both large toenails, and an ulceration on the left second toe that was healing.  *Id*.

Dr. Shayevitz stated plaintiff's prognosis was poor and indicated that he was markedly limited by his poor vision, which did not respond to amelioration with eyeglasses, and he had degenerative arthritis in his hands.  *Id*.  Dr. Shayevitz further opined that plaintiff was moderately limited in the use of his hands, particularly with

---

[9] Sclerae is the "tough fibrous tunic forming the outer envelope of the eye and covering all of the eyeball except the cornea."  THE AMERICAN HERITAGE MEDICAL DICTIONARY 736 (Revised ed. 2007).

[10] Anicteric refers to being without jaundice.  *See* The Free Dictionary, http://www.thefreedictionary.com/anicteric.

[11] Conjunctivae is the "mucous membrane that lines the inner eyelid and the exposed surface of the eyeball."  THE AMERICAN HERITAGE MEDICAL DICTIONARY 179 (Revised ed. 2007).

fine or repetitive motions, and was moderately to markedly limited by the recurrent ulcerations on his feet as well as inconsistent blood sugar levels, which resulted in episodes requiring hospitalization.  (T. 131-32).

### 6.  State Agency Medical Consultant

On March 4, 2003, a Physical Residual Functional Capacity Assessment was completed by an individual whose name is indecipherable.  (T. 133-38).  It is unclear whether this Assessment was performed by a physician.  This RFC indicated that plaintiff could frequently and occasionally lift ten pounds, stand and/or walk for two hours during an eight-hour work day, and sit for six hours during an eight-hour work day.  (T. 134).  The RFC further indicated that plaintiff had no limitations in pushing or pulling, he could occasionally climb, balance, stoop, kneel, crawl, or crouch, and he had no manipulative, visual, communicative, nor environmental limitations.  (T. 134-37).

### DISCUSSION

### 1.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520

and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to basic work activities.
> If the claimant suffers such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an impairment which
> meets or equals the criteria of an impairment listed in Appendix 1 of the
> regulations.  If the claimant has such an impairment, the [Commissioner]
> will consider him disabled without considering vocational factors such as
> age, education, and work experience; ... .  Assuming the claimant does
> not have listed impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, he has the residual functional capacity to
> perform his past work.  Finally, if the claimant is unable to perform his
> past work, the [Commissioner] then determines whether there is other
> work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920.

The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that his impairment prevents him from performing

his past work, the burden then shifts to the Commissioner to prove the final step.

*Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

15

2.   **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence

must also include that which detracts from its weight." *Williams*, 859 F.2d at 258.

However, a reviewing court cannot substitute its interpretation of the administrative

record for that of the Commissioner if the record contains substantial support for the

ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also*

*Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212

(1983).

**3.    Severity of Impairments**

As mentioned above, if a claimant is not engaging in substantial gainful

activity, then at step two of the sequential evaluation process a determination must be

made as to whether a medically determinable physical or mental impairment exists.

20 C.F.R. §§ 404.1508, 416.908; *see also* Social Security Ruling ("S.S.R.") 96-4p,

1996 WL 374187, at *1-2, *Titles II and XVI: Symptoms, Medically Determinable*

*Physical and Mental Impairments, and Exertional and Nonexertional Limitations*

(S.S.A. 1996). An "impairment must result from anatomical, physiological, or

psychological abnormalities which can be shown by medically acceptable clinical and

laboratory diagnostic techniques . . . . [that] consist[] of signs, symptoms, and

laboratory findings, not only by [a claimant's] statement of symptoms[.]" 20 C.F.R.

§§ 404.1508, 416.908.

If a medically determinable impairment exists, a decision must be rendered as to

whether it is a severe impairment that significantly limits the physical or mental ability

to do basic work activities. The ability to do basic work activities is defined as "the

abilities and activities necessary to do most jobs." 20 C.F.R. §§ 404.1521(b),

17

416.921(b).  Basic work activities which are relevant for evaluating the severity of an

impairment include:

> (1) Physical functions such as walking, standing, lifting, pushing, pulling,
> reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work
> situations; and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b), 416.921(b); *see Pickering v. Chater*, 951 F. Supp. 418, 424

(S.D.N.Y.1996); *see also* S.S.R. 85-28, 1985 WL 56856, at *3-4, *Titles II and XVI:*

*Medical Impairments That Are Not Severe* (S.S.A. 1985).

Age, education, and work experience are not evaluated in determining if the

impairment or combination of impairments are severe.  20 C.F.R. §§ 404.1520(c),

416.920(c).  The severity analysis does no more than "screen out de minimis claims."

*Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995).  If the disability claim rises

above the de minimis level, then further analysis is warranted.  *Id.*  Where a claimant

alleges multiple impairments, the combined effects of all impairments must be

considered, regardless of whether any impairment, if considered separately, would be

of sufficient severity.  20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

Here, while the ALJ determined that plaintiff's diabetes was a severe

impairment, he found that plaintiff's foot ulcers and vision problems were not severe.

(T. 14-15).  In making these findings, the ALJ stated that plaintiff's complaints

regarding his foot ulcers were not supported by recent medical records from Dr. Ang

18

that indicated the ulcers were cleared up and that there were no problems with his feet. (T. 14). The ALJ also stated that plaintiff's testimony regarding his vision and his ability to drive and watch television was inconsistent with his claims. *Id.* He further referred to Dr. Andrews' assessment that while plaintiff had proliferative diabetic retinopathy, there was no active disease present and there were no resulting limitations in his activities. *Id*. This court finds that the ALJ's statements about plaintiff's complaints regarding his foot ulcers are supported by substantial evidence in the record. Dr. Saponara, a podiatrist connected to the Joslin Diabetes Center, is certainly an expert in podiatry and in foot problems connected to diabetes. Dr. Saponara examined plaintiff on several occasions and did not place any restrictions on plaintiff's activities because of the foot ulcer problem. As Dr. Saponara noted, the medical cream and the medical regimen he prescribed worked "wonderfully" in healing plaintiff's foot ulcers (T. 91), and he recommended ***only*** orthopedic shoes and diabetic socks for plaintiff's foot problems. He also recommended that plaintiff reduce his smoking since smoking had a "detrimental" impact on plaintiff's diabetes. (T. 88).

Dr. Ang's notes show on several occasions that plaintiff ***was not adhering to medical recommendations*** since his diabetes was in "poor control." (T. 231, 233, 235, 237, 241). Dr. Ang specifically stated that plaintiff's diabetes was under poor control "***due to poor compliance***" (emphasis supplied). Plaintiff was not following instructions with his medications and not checking his blood sugar according to Dr. Ang's recommendations. (T. 235).

19

Although NP Wheaton at the Family Health Network stated that plaintiff could not be on his feet or work for any period of time (T. 176), she is not a medical doctor and is not as qualified as specialists in diabetes to render opinions about plaintiff's ability to work based on his diabetes.  Under the regulations, Nurse Practitioner Wheaton is not an acceptable medical source for medical opinions.  *See* 20 C.F.R. §§ 404.1513(a), 416.913(a).  Plaintiff is clearly being treated by specialists in diabetes at a very specialized diabetes center attached to a teaching hospital in Syracuse, New York.  While it is true that Dr. Ang stated that he does not complete disability forms, it is not clear why a ***physician*** in the Family Health Network did not render any opinion about the plaintiff's medical condition.  The court notes that plaintiff's counsel was given additional time to supplement the record, and apparently did so on two occasions since the ALJ reopened the record twice to include new exhibits.  (T. 281-82).

An ALJ has an affirmative duty, even if the claimant is represented by counsel, to develop the medical record if it is incomplete.  *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. § 416.912(d).  Although the ALJ has this affirmative duty, ***plaintiff's counsel was doing that after the hearing of June 30, 2004 through August 5, 2004***.  Plaintiff's counsel also had the opportunity to present evidence to the Appeals Council after the ALJ's decision of August 27, 2004.  (T. 19).  The record does not show that any further medical records were submitted after the ALJ's decision.

With respect to plaintiff's vision, the ALJ did not err in making the

determination that the condition was ***not*** severe.  While plaintiff testified that as a result of poor vision he does not drive to unknown areas, he also testified that he is able to drive to local areas.  (*See* T. 277).  He further testified that in the course of a day, he watches six hours of television.  (T. 274).  Dr. Anthony Andrews is not only an ophthalmologist but is part of the Department of Ophthalmology at Upstate Medical University and is involved in teaching in the field of ophthalmology.  His opinion in his letter of June 18,2004 states very clearly that "***there is no limitation on [plaintiff's] activity***." (emphasis supplied) (T. 228) He further states in his letter that plaintiff notes that he had no changes in his vision "since 1996."  (T. 228).  Dr. Andrews found that plaintiff had retinopathy, but had "no active disease at present." (T. 228).  The ALJ was justified in relying on this expert opinion from an ophthalmologist attached to Upstate Medical University.  The ALJ was also justified in relying on plaintiff's testimony about watching television for six hours a day. There is, therefore, substantial evidence in the record to support the ALJ's finding that plaintiff's ability to work was not affected by his vision.

**4.     Treating Physician Rule**

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d), 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d

28, 32 (2d Cir. 2004).  The ALJ must, however, properly analyze the reasons that the report is rejected.  *Id.*  An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

It is clear in this case that plaintiff's treating specialists in the field of diabetes, Drs. Ang, Saponara, and Andrews did not find any disabilities based solely on his diabetes.  Their opinions about plaintiff's medical condition are entitled to great weight since they are experts in the field and the record contains evidence of many visits which support their findings.

While Nurse Practitioner Wheaton has been treating plaintiff for several years, her opinion is not entitled to the weight of a physician since she is only a Nurse Practitioner.  It is clear from the record that plaintiff was actively seeking disability, and that plaintiff's treating diabetes specialists would not render that opinion.  It is unclear whether Nurse Practitioner Wheaton was rendering her opinion based on consultation with a medical doctor or simply because of plaintiff's insistence.

## 5.    **Residual Functional Capacity (RFC)**

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945; *see Martona v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and ***may not simply make conclusory statements regarding a plaintiff's capacities***.  *Verginio v.*

*Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at
183.

In this case, the ALJ determined that although plaintiff's limitations precluded
the performance of his past-relevant work, plaintiff retained "the residual functional
capacity to perform the exertional demands of sedentary work[12] with lifting up to 10
pounds occasionally and less than 10 pounds frequently." (T. 16). In making this
determination, the ALJ gave no weight to the limitations stated by Dr. Shayevitz
because they were not supported by the findings made within his examination nor
were they consistent other evidence in the record. (T. 16). The ALJ also gave no
weight to NP Wheaton's June 2004 letter that stated plaintiff was disabled and could
not work because she was not a doctor. *Id.*

In regards to Dr. Shayevitz's opinions, the opinion of a state agency
consultative examiner may constitute substantial evidence to support an ALJ's
determination, provided that there is other supporting evidence in the record. *See* 20
C.F.R. §§ 404.1527(f), 416.927(f); *see also Brunson v. Barnhart*, 2002 WL 393078, at
*14 (E.D.N.Y. Mar. 14, 2002) (noting that the opinions of non-examining sources may
be considered provided they are supported by evidence in the record).

Here, the only supporting evidence of the limitations on plaintiff's abilities is

---

[12] Sedentary work involves:
lifting no more than 10 pounds at a time and occasionally lifting or carrying articles
like docket files, ledgers, and small tools. Although a sedentary job is defined as one
which involves sitting, a certain amount of walking and standing is often necessary
in carrying out job duties. Jobs are sedentary if walking and standing are required
occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

from NP Wheaton.  However, as noted above, Nurse Practitioner Wheaton is not considered an acceptable medical source under the Regulations.  *See* 20 C.F.R. §§ 404.1513(a), 416.913(a).

Dr. Shayevitz found that there was thickening of certain joints of the last four digits of plaintiff's  hands, however, he then stated that plaintiff's hand and finger dexterity was intact and grip strength was 5/5.  (T. 131)  Dr. Shayevitz reported decreased sensation to touch below plaintiff's wrists and ankles bilaterally, but then found that there was full range of motion of plaintiff's wrists and ankles bilaterally. *Id.*  The remainder of Dr. Shayevitz's report shows normal findings apart from plaintiff's vision.  (T. 130-31).  Other evidence in the record seems to contradict Dr. Shayevitz's findings about plaintiffs hands.  For example, x-rays of plaintiff's hands during May 2004 were normal and blood tests for an "arthritis panel" were negative. (T. 219).  Plaintiff's records from the Family Health Network, therefore, do not support plaintiff's claims of arthritis in his hands.  (T. 219).  There is substantial evidence, therefore, for the ALJ's finding that there were no limitations on plaintiff's use of his hands.

A state agency medical consultant[13] found that plaintiff could frequently and occasionally lift ten pounds, stand and/or walk for two hours during an eight-hour work day, and sit for six hours during an eight-hour work day.  (T. 134).  The consultant further indicated that plaintiff had no limitations in pushing or pulling, he could occasionally climb, balance, stoop, kneel, crawl, or crouch, and he had no

---

[13] It is unclear from the record whether the medical consultant was a doctor or just an analyst.

manipulative, visual, communicative, nor environmental limitations.  (T. 134-37).

Although the state agency medical consultant found that plaintiff could frequently ***and*** occasionally lift ten pounds, the ALJ's finding is slightly different. The ALJ determined that plaintiff could lift up to ten pounds occasionally and ***less than*** ten pounds frequently.  This slight discrepancy between the ALJ's finding and the state agency consultant is not significant.  The ALJ did not discuss any other limitations regarding plaintiff's ability to sit, stand, or walk.

In failing to specify the amount of time plaintiff could sit, stand, and walk, the ALJ erred by not assessing plaintiff's work-related abilities on a function-by-function basis.  S.S.R. 96-8p, 1996 WL 374184, at *1-2, *Titles II and XVI:  Assessing Residual Functional Capacity in Initial Claims* (S.S.A. 1996) (stating that ; *see also Mardukhayev v. Comm'r of Soc. Sec.*, 2002 WL 603041, at *5 (E.D.N.Y. Mar. 29, 2002).  Although the ability to do sedentary work necessarily implies the most a claimant can do despite his limitations, such does not absolve the ALJ from his duty to outline, function-by-function, plaintiff's restrictions in his ability to do work-related activities and whether or not he has the capacity to work on a regular and continuing basis.  *See Brown v. Barnhart*, 2002 WL 603044, at *5-7 (E.D.N.Y. Apr. 15, 2002).

Accordingly, the ALJ erred in his RFC determination by concluding that plaintiff could perform sedentary work without the benefit of medical evidence from a medical source describing his ability to sit, stand, and walk.

**6.**   **Non-Exertional Limitations**

Non-exertional limitations refer to limitations affecting the claimant's ability to

meet the requirements of a job other than strength demands.  20 C.F.R. §§
404.1569a(c), 416.969a(c).  This includes, *inter alia*, limitations or restrictions in
functioning due to nervousness, anxiety or depression, maintaining attention or
concentration, understanding or remembering detailed instructions, and performing
manipulative or postural functions such as reaching, handling, stooping, climbing,
crawling, or crouching.  *Id*.; *see also* S.S.R. 83-14, 1983 WL 31254, at *1, *Program
Policy Statement–Titles II and XVI: Capability to do Other Work – The Medical
Vocational Rules as a Framework for Evaluating a Combination of Exertional and
Nonexertional Impairments* (S.S.A. 1983).

     If a plaintiff's non-exertional impairments "significantly limit the range of
work" permitted by the plaintiff's exertional limitations, then the ALJ may not use the
Medical Vocational Guidelines ("Guidelines") exclusively to determine whether
plaintiff is disabled.  *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986).  If the
plaintiff's range of work is significantly limited by his non-exertional impairments,
then the ALJ must present the testimony of a vocational expert or other similar
evidence regarding the availability of other work in the national economy that plaintiff
can perform.  *Id.*  A vocational expert may provide testimony regarding the existence
of jobs in the national economy and whether a particular claimant may be able to
perform any of those jobs given his or her functional limitations.  *See Rautio v.
Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545,
1553-54 (2d Cir. 1983).

     In this case, the ALJ did not find that plaintiff suffered from non-exertional

limitations that significantly diminished the range of work that could be performed as he stated that plaintiff could perform a full range of sedentary work.  (T. 17).  As such, the ALJ, taking into account plaintiff's age, education, work experience, and RFC solely utilized the Guidelines, instead of using testimony from a vocational expert, to make a determination regarding disability.  *Id.*  Thus, the ALJ stated that according to Rule 201.28, a finding of not disabled was directed.  *Id.*

Here, even though Nurse Practitioner Wheaton stated that plaintiff could not work at all, she did not specify any non-exertional limitations that would affect plaintiff's ability to work and medical findings contradict her conclusion.  (T. 98, 176).  In September 2003, x-rays of plaintiff's left elbow showed normal alignment and position, no joint effusion, and no acute abnormalities.  (T. 215).  On May 27, 2004, it was noted that plaintiff had full range of motion of his back.  (T. 221). Thereafter, on May 28, 2004, x-rays taken of plaintiff's hands revealed normal alignment and position of the bones as well as no fractures or radiopaque foreign bodies.  (T. 192).  The same day, x-rays were also taken of his thoracic spine and showed minimal dextroscoliosis, no fractures, destructive osseous lesions, or sublaxation, and only mild degenerative changes along the vertebral body endplates. (T. 193).  Additionally, x-rays of plaintiff's lumbar spine revealed normal alignment, that vertebral bodies and disc spaces were well maintained, that SI joints were unremarkable, and pedicles and posterior elements were intact.  (T. 194).  Then, on June 28, 2004, an arthritis panel taken produced negative tests results.  (T. 219).

Dr. Shayevitz's conclusions that plaintiff was moderately limited in the use of

27

his hands and moderately to markedly limited by the ulcers on his feet are also belied by the x-ray evidence noted above as well as by findings made within his own report. Dr. Shayevitz found that plaintiff was in no acute distress, gait and stance were normal, squat was full, he could walk on heels and toes without difficulty, he needed no help getting on and off the examining table or changing for the exam, and he could rise from a chair without difficulty.  (T. 130).  Dr. Shayevitz also stated that there was full range of motion of the cervical and lumbar spine.  (T. 131).  Moreover, Dr. Shayevitz found that plaintiff's hand and finger dexterity was intact and grip strength was 5/5.  *Id*.  Although Dr. Shayevitz stated that there was decreased sensation to touch below plaintiff's wrists and ankles bilaterally, he stated there was full range of motion of plaintiff's wrists and ankles bilaterally.  *Id*.  Dr. Shayevitz further noted that plaintiff's joints were stable and nontender and that there was no redness, heat, swelling, or effusion.  *Id*.

The "medical consultant" who completed the Physical RFC Assessment also supported a finding that any non-exertional limitations would not significantly diminish the range of work plaintiff could perform.  The consultant stated that plaintiff had only occasional postural limitations.  (T. 135).  Furthermore, it was indicated that plaintiff had no limitations in pushing or pulling nor any manipulative limitations.  (T. 134-35).  Unfortunately, this opinion may be entitled to very little weight, if any, since the writer may not be a medical professional.  The medical evidence in the record demonstrates by substantial evidence that plaintiff did not suffer from non-exertional limitations that would significantly diminish the range of work he could perform.

28

7.    **Remand or Reversal**

Plaintiff argues that the decision of the Commissioner should be remanded solely for the calculation of benefits.  Plaintiff alternatively argues that the decision should be reversed and remanded for a new hearing and decision.  Remand is appropriate where there are gaps in the record or further development of the evidence is needed.  *See Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *Marcus v. Califano*, 615 F.2d 23 (2d Cir. 1979) (remanded for reconsideration under standard that subjective evidence of disabling pain, if credited, may support a finding of disability); *Cutler v. Weinberger*, 516 F.2d 1282 (2d Cir. 1975).  Reversal is appropriate, however, when there is "persuasive proof of disability" in the record and remand for further evidentiary development would not serve any purpose.  *Parker*, 626 F.2d at 235; *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec'y of Health & Human Serv.*, 705 F.2d 638, 644 (2d Cir. 1983) (reversal without remand for additional evidence particularly appropriate where payment of benefits already delayed for four years; remand would likely result in further lengthening the "painfully slow process" of determining disability).  In this case, the ALJ's failure to properly analyze plaintiff's residual functional capacity requires remand and not reversal since there is ***no persuasive proof*** of disability.

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED**, that the decision of the Commissioner be **REVERSED**, and this case be **REMANDED** pursuant to **Sentence Four** of 42 U.S.C. § 405(g) for a proper determination of plaintiff's residual functional capacity, and the possible need

for vocational expert testimony.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: January 18, 2008

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge

30